UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


WENDELL DWAYNE O'NEAL,                      CIVIL NO. 06-2336 (ADM/JSM)

     Plaintiff,

v.                                          <u>REPORT AND RECOMMENDATION</u>

SHERI MOORE,
    St. Paul City Clerk,
PETE CRUM,
    St. Paul Police Officer,
YILENG VANG,
    St. Paul Police Officer,
NIKKOLE GRAUPMANNN,
JOHN CHOI, and the
CITY OF ST. PAUL,

    Defendants,
Jointly; Severally; Officially;
As Agents, and Municipality.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon plaintiff's Motion for Summary Judgment [Docket No. 292], and upon defendants' Motion for Summary Judgment [Docket No. 253]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c). For the following reasons, the Court recommends that defendants' Motion for Summary Judgment [Docket No. 253] be granted, and plaintiff's Motion for Summary Judgment [Docket No. 292] be denied.

I.      **FACTUAL BACKGROUND**

This suit arises out of an incident which took place at the Radisson Hotel in St. Paul on August 15, 2005, at which time plaintiff was arrested by the St. Paul Police Department in the early hours of the morning, taken into custody, and released the next day after plaintiff pled guilty to the petty misdemeanor charge of trespass. As described in his Second Amended Complaint,[1] on August 15, 2005, plaintiff was in the lobby of the Radisson Hotel in St. Paul, Minnesota. Second Amended Complaint, ¶ 1. Plaintiff called 911 in order to obtain his wallet, which was in possession of the St. Paul Police Department. Id. Officer Yileng Vang was dispatched to the scene. Second Amended

---

[1]     Over the course of this litigation, there have been five separate versions of the Complaint. Plaintiff originally filed his Complaint in the Second Judicial District Court of Minnesota on May 16, 2006. On May 19, 2006, plaintiff filed a Supplemental Civil Complaint in the Second Judicial District Court of Minnesota, adding eight counts to the 13 counts in the original Complaint. As plaintiff did not bring a motion to supplement his Complaint, the Supplemental Civil Complaint never became operative in this case. Defendants removed the case to this Court on June 8, 2006. [Docket No. 1]. On February 15, 2007, plaintiff moved the Court for leave to amend his Complaint, and filed an Amended Civil Complaint with this Court in conjunction with that motion. [Docket No. 72]. However, on March 19, 2007, at the hearing on his motion for leave to amend, plaintiff informed the Court that he was filing a Second Amended Civil Complaint [Docket No. 104] that same day, and that it is this pleading that he wished to govern this case. This Court addressed plaintiff's Motion to Amend the Complaint utilizing plaintiff's proposed Second Amended Civil Complaint, and denied several proposed amendments. See Order dated September 20, 2007 [Docket No. 240]. Three days after the Court's ruling on the motion to amend, plaintiff filed his New Second Amended Civil Complaint (hereafter referred to as Second Amended Complaint"). [Docket No. 242]. As such, the Second Amended Complaint is the operative Complaint in this case. The Court now observes that plaintiff's motion for summary judgment appears to advance new claims that are not found in his Second Amended Complaint. For example, plaintiff seems to make allegations against a new defendant named Harrington, who appears to be the St. Paul Police Chief (Pl. Summ. Judgmt. Mem., pp. 3, 12, 14, 35, 42, 49); and that Officer Vang unlawfully broke in to plaintiff's duffel bag for an illegal contraband search and stole plaintiff's money, medication and clothing (Id., pp. 9-10, 34). To the extent that plaintiff is attempting to raise claims not asserted in his Second Amended Complaint, they are not properly before this Court, and therefore will not be addressed.

Complaint, ¶ 2.  Plaintiff observed defendant Officer Vang outside of the hotel.  Second Amended Complaint, ¶ 3.  Believing that Officer Vang was responding to his 911 call, plaintiff proceeded towards him.  Id.  According to plaintiff, Officer Vang then assaulted him by pointing his service weapon at him, causing him to retreat back inside of the hotel.  Id.  Plaintiff alerted a hotel security agent, Nina Cook, to the assault made against him by Officer Vang.  Second Amended Complaint, ¶ 4.  Plaintiff used a pay phone and called 911 again, asking for a supervisory officer to be sent to investigate Officer Vang's behavior.  Id.  After waiting for a response to his second 911 call, plaintiff asked Cook to call 911 for him from her hotel phone which she did.  Second Amended Complaint, ¶ 5.  Defendant Officer Nikkole Graupmann was dispatched to the hotel in response to the second 911 call, but not until after Officer Vang had arrested plaintiff.  Second Amended Complaint, ¶ 6.  According to plaintiff, Officer Graupmann never did investigate the second 911 call.  Id.  Following his arrest, plaintiff was subsequently taken to the Ramsey County Jail where he was detained.  Second Amended Complaint, ¶ 34.  Later that day, he pled guilty to a petty misdemeanor charge of trespass.  See O'Neal v. State of Minnesota, 2006 WL 2947470 at *1 (Minn.App. Oct. 17, 2006).

After his release, plaintiff requested, pursuant to the Minnesota Government Data Practices Act ("MGDPA") release of certain records from the St. Paul Police Department surrounding his encounter with and arrest by police on August 15, 2005.  Additionally, plaintiff filed an administrative complaint against Officer Vang alleging excessive force

and theft, and complaints against Officers Vang and Graupmann with the Board of P.O.S.T.[2] Second Amended Complaint, ¶ 74.

The undisputed facts that bear on the parties' respective motions are as follows: On August 31, 2005, plaintiff made a written MGDPA request for records of the 911 dispatch records – documents and recordings – he and Nina Cook made on August 14 and 15, 2005. Hanson Aff., Ex. 10 (Affidavit of Don Smiley dated October 22, 2007, hereafter referred to as "First Smiley Aff."), ¶ 2, Ex. A; Pl. Summ. Judgmt. Mem., Ex. 2 (same). Specifically, plaintiff requested "Disclosure of 911 Dispatch Records, documents, and recordings, 08-14-05, between 11:00 p and 11:59 p, 08-15-05, between 12 a and 1:30 a, Radisson Hotel, pay phone, and service desk, also, 911 dispatches of 8-28-05, detained." Id. Plaintiff addressed the request to Officer Smiley and stated that "pursuant to discussion this morning, 09:25 a please provide captioned request through police chief channels, for clearance, as detailed to myself, within 24 hrs." Id. In response, Officer Smiley searched for the information using the Computer Assisted Dispatch System and found two 911 calls that fell within the dates and time periods and locations that plaintiff specified. Hanson Aff., Ex. 11 (Affidavit of Don Smiley dated June 14, 2007, hereafter referred to as "Second Smiley Aff."), ¶ 5; Pl. Summ. Judgmt. Mem., Ex. 3 (same). Officer Smiley went to the centralized recording system and made a copy of both calls. Hanson Aff., Ex. 11 (Second Smiley Aff.), ¶ 6; Pl. Summ. Judgmt. Mem., Ex. 3 (same). Because all 911 tapes must be directed to the Police Department's Public Information Officer for release, the tapes were directed to

---

[2]     The Minnesota Board of P.O.S.T. referenced by plaintiff is the Minnesota Board of Peace Officer Standards and Training. See http://www.dps.state.mn.us/newpost/posthome.asp.

Officer Crum, who was the Public Information Officer at the time of the request. Hanson Aff., Ex. 10 (First Smiley Aff.), ¶ 3; Ex. 11 (Second Smiley Aff.), ¶ 8; Pl. Summ. Judgmt. Mem., Exs. 2, 3 (same). Officer Smiley informed plaintiff by phone that he was making the tapes and forwarding them to Officer Crum. Hanson Aff., Ex. 10 (First Smiley Aff.), ¶ 3; Pl. Summ. Judgmt. Mem., Ex. 3 (same).

In early September of 2005, Officer Crum was assigned to plaintiff's MGDPA request. Hanson Aff., Ex. 12 (Affidavit of Peter Crum dated June 14, 2007, hereafter referred to as "First Crum Aff."), ¶ 4; Hanson Aff., Ex. 13 (Affidavit of Peter Crum dated October 17, 2007, hereafter referred to as "Second Crum Aff."), ¶ 4; Pl. Summ. Judgmt. Mem., Ex. 9 (same).[3] Officer Smiley provided Officer Crum with four 911 calls; the first two were for 911 calls that occurred on August 15, 2005 from the Radisson Hotel, with CN numbers 05-173038 and 05-173047, and the second two calls were for an incident that occurred on August 28, 2005, with CN numbers 05-184607 and 05-184676. Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 7; Pl. Summ. Judgmt. Mem., Ex. 9 (same). Because 911 tapes contain confidential information that can only be released to the caller, Officer Crum notified plaintiff that only one of the four calls responsive to his request was authorized to be released to plaintiff. Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 9; Pl. Summ. Judgmt. Mem., Ex 9 (same). Officer Crum spoke to plaintiff several times on the phone, and in an attempt to resolve the situation, notified plaintiff that he could request a transcript of the tapes of all of the calls. Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 10; Pl. Summ. Judgmt. Mem., Ex. 9 (same). On October 14, 2005, plaintiff faxed a written request for a transcript of the tapes to Officer Crum. Hanson Aff., Ex. 14 (Fax

---

[3]     Exhibit 9 to Plaintiff's Summary Judgment Memorandum contains both the First and Second Crum Affidavits.

Cover Sheet to Officer Crum from plaintiff and attached letter); Pl. Summ. Judgmt. Mem., Ex. 7 (same).  That request referenced "production of 911 dispatch calls, 14 Aug 05/15 Aug 05 Radisson Hotel, St. Paul, MN; Wendell D. O'Neal; Nina Cook, Req. for Assist., Including, Identity of 911 Dispatcher; all police personnel dispatched to Radisson Hotel; times of dispatches; and police reports, confirming duty clearance from dispatches."  Hanson Aff., Ex. 14 (Letter dated October 14, 2005 from plaintiff to Officer Crum), p. 2; Pl. Summ. Judgmt., Ex. 7 (same).  The letter stated that "Pursuant to teleconference, 13 Oct 05., please provide transcript of 911 calls; dispatches; arrival/departure records; all data requested, above records.  Also, notice of costs to produce, and indication of anticipated time for delivery, by U.S. Mail transaction."  Id.

On October 21, 2005, defendant Shari Moore, the City Clerk for the City of St. Paul, received a letter from plaintiff which requested policies and procedures for the City of St. Paul.   Hanson Aff., Ex. 17 (Def. Shari Moore's Answers to Plaintiff's Interrogatories), Answer to Interrogatory No. 2.  Attached to the letter was a Citizen Services Office Complaint Form, dated October 24, 2005, and attached to the Complaint Form were plaintiff's August 31, 2005 and October 14, 2005 requests.  Id.; Hanson Aff., Ex. 18 (Letter dated October 21, 2005 from plaintiff to Moore); Pl. Summ. Judgmt. Mem., Ex. 10 (Complaint/Opinion Form).

On or around October 26, 2005, the transcripts of the four calls were completed; Officer Crum contacted plaintiff by fax and notified him that the transcripts and tapes were available, and that he could have the public version of the police report from the incident on August 15, 2005.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 11; Pl. Summ.

Judgmt. Mem., Ex. 9 (same).  Officer Crum also informed plaintiff of the costs of the transcript and tapes.  Id.

On October 28, 2005, Officer Crum faxed plaintiff a confirmation that the information plaintiff had requested on October 14, 2005, was ready to be picked up. Hanson Aff., Ex. 15 (Fax Transmittal dated October 28, 2005 from Officer Crum to plaintiff); Pl. Summ. Judgmt. Mem., Ex. 8 (same).  The same day, plaintiff inquired about receiving the tapes via certified mail; Officer Crum informed plaintiff, after speaking with an assistant city attorney assigned to represent the St. Paul Police Department on issues concerning the MGDPA, that the 911 tapes could not be released without identification.  Hanson Aff., Ex. 13 (Second Crum Aff.), ¶¶ 9, 10; Pl. Summ. Judgmt. Mem., Ex. 9 (same).

Moore responded to plaintiff's October 21, 2005 letter on November 9, 2005. Hanson Aff., Ex. 19 (Letter dated Nov. 9, 2005 from Moore to plaintiff); Pl. Summ. Judgmt. Mem., Ex. 11 (same).  First, Moore explained the following to plaintiff regarding his request for 911 tapes:

> You have made telephone requests in the month of October 2005, of the Saint Paul Police Department for 911 tapes for Case Numbers 05-173038, 05-173047, 05-184607, and 05-184676.[4] Officer Pete Crum of the St. Paul Police Department explained each time that 911 tapes contain confidential information that can only be released to the 911 caller.  You were told that if you wanted the actual tape, you would have to come, in person, to the St. Paul Police Headquarters with a valid picture ID and then you could only get the tapes of calls you made.  Officer Crum offered you redacted

---

[4]    CN numbers 05-173038 and 05-173047 are for the first two 911 calls that occurred on August 15, 2005 from the Radisson Hotel;  CN numbers 05-184607 and 05-184676 are for the two calls plaintiff requested from an incident August 28, 2005. Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 7; Pl. Summ. Judgmt. Mem., Ex. 9 (same); see also Hanson Aff., Ex. 10 (First Smiley Aff.), ¶ 2, Ex. A; Pl. Summ. Judgmt. Mem., Ex. 2 (both containing plaintiff's request for the second two calls made August 28, 2005).

transcripts that could be sent through the mail, but would require a transcription fee.

Id. The letter then reiterated plaintiff's communications with Officer Crum on October 14 and 26, and informed plaintiff that he would have to pay for any data. Id. Moore stated that she understood that plaintiff could not afford the costs for the requested data, and explained that since Officer Crum had not received payment for the data, it had not been mailed to plaintiff. Id. Moore also stated that she understood that plaintiff had informed Officer Crum that he was returning to Minnesota for the trial in November. Id. Moore informed plaintiff that pursuant to the MGDPA, he could visit the St. Paul Police Department Headquarters to review public portions of the manuals and policies he had requested in his October 21 letter, or obtain copies at a cost of 25 cents per page. Id. Moore additionally stated that the St. Paul City Attorney's Office, Criminal Division, also had six pages of material for him, which plaintiff could view or pay for copies by contacting her; that plaintiff would have to contact the Ramsey County Sheriff's Office if he had any questions on detention because that office was responsible for custodial detention of individuals in St. Paul; and referred plaintiff to the Ramsey County District Court for questions regarding arrest matters once there was an arraignment, and regarding acceptance of pleas and setting of fines penalties. Id.

On May 17, 2006, plaintiff sent Moore a "Notice of Inaccurate Data." Hanson Aff., Ex. 21 (Notice). In the Notice, plaintiff informed Moore that he believed the 911 records he received were not complete because they did not contain his second 911 call requesting the dispatch of an officer to supervise Officer Vang, and that he still had not received police reports that were requested, including reports submitted by Officers Vang and Graupmann and a citizens arrest form submitted by Nina Cook. Id.

Officer Crum was unaware of the fact that plaintiff may have made two 911 calls until the Spring of 2006 when plaintiff contacted him and made the allegation that there was a 911 call missing.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 13; Pl. Summ. Judgmt. Mem., Ex. 9 (same).  Officer Crum then checked with the Emergency Communications Center to see if the original tape of the missing 911 call was still available.  Id., ¶ 14.  He was told it had already been recycled.  Id.  According to Officer Crum 911 tapes are recycled every 90-180 days.  Id., ¶ 15.

On June 19, 2006, Moore wrote plaintiff a letter responding to his Notice of Inaccurate Data dated May 17, 2006, informing him that she had conducted a review of the data regarding the August 15, 2005 incident, and that she had determined that the data concerning the incident was complete.  Hanson Aff., Ex. 22 (Letter dated June 19, 2006 to plaintiff from Moore); Pl. Summ. Judgmt. Mem., Ex. 57 (same).  In addition, Moore informed plaintiff that as part of the review process, she had conducted a comparison of the 911 tape and the 911 transcript for the August 15, 2005 incident, and that the transcript had been corrected and was available for his review.  As to plaintiff's position that he had not received all reports compiled by Officers Vang and Graupmann regarding their dispatch to the Radisson Hotel and the citizen's arrest form submitted by Cook, Moore stated that, as she had informed him on November 9, 2005, the 911 transcripts and public versions of the police reports were available for his review, along with the citizen's arrest form, but if he wanted copies, he would have to pay for them. Id.  Moore acknowledged that in his May 17, 2006 Notice plaintiff had made a request for data regarding authorized individuals to receive requests under the MGDPA and any resolution or policy that reflects this authority.  Id.  Moore identified 16 pages of

materials responsive to this request and stated that pursuant to the MGDPA, plaintiff could come to the St. Paul City Clerk's Office and review the public portions of the resolutions and MGDPA policy, or pay for copies of the documents at a cost of twenty-five cents per page. Id.

On August 24, 2006, Moore wrote plaintiff another letter in response to a letter from plaintiff dated July 11, 2006, where he again alleged specific inaccuracies regarding the tapes and transcripts from August 15, 2005. Pl. Summ. Judgmt. Mem., Ex. 61 (Letter from Moore to plaintiff dated August 24, 2006). Moore stated there was no change in her determination that the records, were complete and accurate, with the exception of the 911 transcripts which had been corrected, and that plaintiff had the right to challenge the determination under Minn. Stat. § 13.04, subd. 4. Id.

Plaintiff filed this lawsuit on May 18, 2006. On March 2, 2007, plaintiff paid for and received a tape of the 911 call for CN 05-173038, which is the 911 call he made. Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 12; Pl. Summ. Judgmt. Mem., Ex. 9 (same).[5]

During the course of discovery, defense counsel Meghan Riley provided plaintiff with copies of the following documents: incident recalls for CN Nos. 05-173039 and 05-173047 the 911 emergency transcripts for CN Nos. 05-173038 and 05-173047; the tape for 911 call CN No. 05-173047 and the police reports for CN No. 05-173047;

---

[5]     Crum's affidavit states that he has a receipt dated March 2, 2007, which indicates that plaintiff paid for and received a tape of the 911 call. The Court is unsure whether this is a typographical error, because Crum also stated that plaintiff alleged there was a 911 call missing in the Spring of 2006, and that Crum transferred out of his position as Public Information Officer in July of 2006. See Hanson Aff., Ex. 12 (First Crum Aff.), ¶¶ 13, 16; Pl. Summ. Judgmt. Mem., Ex. 9 (same). On the other hand, the Court also observes that even though Crum stated he has a receipt, he also indicated that during the entire time he was Public Information Officer, plaintiff did not pay for the materials made available to him. Id.

intersection report from the CAD system; and the CN detail reports for 05-173038 and 05-173047.   Hanson Aff., Ex. 23 (Affidavit of Meghan L. Riley), ¶¶ 8-10 Pl. Summ. Judgmt. Mem., Ex. 62 (same); Hanson Aff., Ex. 1 (Incident Recall report for CN No. 05-173038); Ex. 2 (CN Detail Report for CN No. 05-173038); Ex. 4 (Incident Recall report for CN No. 05-173047); Ex. 5 (CN Detail Report for CN No. 05-173047); Ex. 17 (Moore Aff.,), p. 001 (Address/Intersection Report), p. 007-008 (Transcript of call for CN No. 05-173038), p. 009 (Transcript of call for CN No. 05-173047), p. 010-011 (Corrected Transcript of call for CN No. 05-173038), p. 012 (Corrected Transcript of call for CN No. 05-173047); <u>see</u> Pl. Summ. Judgmnt. Mem., Ex. 13 (incident recall report from plaintiff's 911 call (CN No. 05173038)), Ex. 14 (911 transcript for his call (CN No. 05-173038)), Ex. 15 (amended transcript from his call), Ex. 16 (incident recall report from the 911 call made by Radisson Hotel Security (CN No. 05-173047)), Ex. 17 (the corresponding transcript from that call), Ex. 18 (amended corresponding transcript).

Additionally, during discovery, defendants submitted the names of the 911 operators and police dispatchers from August 15, 2005, along with the "City of St. Paul's Guidelines and Procedures for the Minnesota Government Data Practices Act," and various policies and guidelines governing property taken by the St. Paul Police, citizen's arrests and arrests generally.  <u>See</u> Hanson Aff., Ex. 17 (Def. Shari Moore's Answers to Plaintiff's Interrogatories), Answers to Interrogatory Nos. 3, 11, 12, and 13, STP 013-22, 027-053; Pl. Summ. Judgmt. Mem., Ex. 19 (Defendants' Answers to Plaintiff's Interrogatories), Answers to Interrogatory Nos. 3, 11, 12, and 13.

Prior to responding to plaintiff's request for documents, Riley verified with the Police Department that there was no record of a second 911 call from the payphone at

the Radisson on August 15, 2005.  Hanson Aff., Ex. 23 (Riley Aff.) ¶ 11  The CAD records she received did not reflect a second call, and the Police Department verified that the 911 tapes from that day had been recycled and nothing in the CAD system showed a second 911 call from a Radisson hotel pay phone.  Id.

During the course of this litigation, plaintiff subpoenaed records from Qwest phone company, which searched phone logs from two payphones at the Radisson Hotel for August 14 and 15, 2005 and found two calls.  Pl. Summ. Judgmt. Mem., Ex. 22 (Qwest subpoena response number 192782).  Qwest also searched the phone logs for all phones at the Radisson Hotel for August 15, 2005 between the hours of 12:00 a.m. and 3:00 a.m., and found one call.  Pl. Summ. Judgmt. Mem., Ex. 23 (Qwest subpoena response number 196833).  After Riley received the Qwest documents from plaintiff, she again contacted the Police Department to determine if there was a record of a second 911 call.  Hanson Aff., Ex. 23 (Riley Aff.), ¶ 12; Pl. Summ. Judgmt. Mem., Ex. 62 (same).  On June 13, 2007, Riley received a computer printout from the Police Department that showed a second 911 call had been made from a pay phone at the Radisson Hotel on August 15, 2005.  Id., ¶13.  Riley verified that Officer Crum and Moore were not aware of the information until June 13, 2007.  Id., ¶ 14.[6]

On September 26, 2005, plaintiff filed a post-conviction motion to withdraw his guilty plea, and had a scheduled motion hearing before Judge George Stephenson of Ramsey County District Court on November 4, 2005, at which plaintiff failed to appear.

---

[6]     Plaintiff sent Moore another letter on October 8, 2007 asking her to replace the inaccurate  emergency dispatch records from August 15, 2005 with accurate records. Pl. Summ. Judgmt. Mem., Ex. 64.  On November 7, 2007, Moore replied to plaintiff stating that the records were accurate and complete, and that the issues had been raised in his pending lawsuit.  Pl. Summ. Judgmt. Mem., Ex. 68.

Pl. Summ. Judgmt. Mem., p. 17; <u>O'Neal v. State of Minnesota</u>, 2006 WL 2947470 at \*2 (Minn.App. Oct. 17, 2006).  Plaintiff's motion was denied, and he appealed that decision the Minnesota Court of Appeals, which affirmed his conviction, and to the Minnesota Supreme Court, which denied review on December 20, 2006.  <u>See</u> <u>O'Neal v. State of Minnesota</u>, 2006 WL 2947470 at \*1 (Minn.App. Oct. 17, 2006).  Plaintiff filed a second petition for post-conviction relief on August 21, 2007.  <u>See</u> <u>O'Neal v. State of Minnesota</u>, 2008 WL 2496998 at \*1 (Minn.App. June 24, 2008).  The district court summarily denied the petition on the grounds that his claims were procedurally barred, and the Minnesota Court of Appeals affirmed.  <u>See</u> <u>Id</u>.

## II.    ALLEGATIONS IN THE COMPLAINT

Now before this Court are cross-motions for summary judgment by the parties. In order to give a context for the Court's decision on these motions, the Court finds it necessary to first summarize the 18 different counts that plaintiff has alleged in his Second Amended Complaint.

In Count I, plaintiff alleged that Officer Graupmann failed to investigate plaintiff's second 911 call requesting supervision of Officer Vang, and therefore, violated plaintiff's civil rights based on equal protection and discrimination under the Minnesota Human Rights Act ("MHRA"), 42 U.S.C. §§1981, 1983, and 2000 <u>et seq</u>. and the MDGPA.

In Count II, plaintiff alleged that neither Officer Vang nor Officer Graupmann responded to his 911 calls for assistance to recover his wallet and for supervision.  As such, he asserted that with retaliatory and discriminative motives, Officers Vang and Graupmann failed to perform services to which he was entitled under the state and federal laws, all in violation of the MHRA, 42 U.S.C. §§1981, 1983, and 2000 <u>et seq</u>.

In Count III,[7] plaintiff alleged that based on the conduct of Officer Smiley, Officer Crum and the Clerk for the City of St. Paul, Shari Moore, he was denied access to the records he sought pursuant to the MGDPA, that such conduct amounted to willful and wanton neglect of their duties, and violated the MGDPA, and other state and federal laws prohibiting discrimination and promoting equal protection under the law.

In Count IV, plaintiff alleged that Officer Crum provided an unlawful and false response to plaintiff's request for records in violation of the MGDPA, usurped the authority of Moore, and denied plaintiff his civil rights to obtain the records in an attempt to conceal evidence, obstruct justice, and further deny him access to the courts.

In Count V, plaintiff alleged that contrary to lawful provisions of the MGDPA, Officer Crum wrongfully advised him that the law prohibited mailing a copy of the taped version of his two 911 records to him.

In Count VI, plaintiff alleged that in order to protect Officers Vang and Graupmann, Officer Crum wrongfully denied, concealed and suppressed the records plaintiff had requested by pretending there was a requirement to physically verify plaintiff's identification.  Plaintiff claimed this conduct violated his civil rights under the MGDPA, and the laws prohibiting discrimination and promoting equal protection under the law.

In Count VII, plaintiff alleged that Officer Crum, while usurping the authority of Moore, created a financial barrier for plaintiff to prevent him from obtaining the records he wanted by causing every 911 call made by plaintiff during August 2005 to be transcribed, and by unlawfully charging him for a transcript of 911 records he did not

---

[7]     Counts III through X are entitled "WILFUL NEGLECT AND, OR GROSS NEGLIGENCE, IN CONSPIRED M.G.D.P.A. VIOLATIONS."

want in an effort to deny disclosure of the records to plaintiff that he did want.  Plaintiff alleged that this conduct was a "CONSPIRED MGDPA VIOLATION" and violated plaintiff's state and federal civil rights.

In Count VIII, plaintiff alleged that while Moore did provide plaintiff with a response to his request for records on November 9, 2005, he did not receive the response during the pendency of his motion for post-conviction relief to withdraw his August 15, 2005 guilty plea.  Plaintiff claimed this delay in responding to his request for records was a "CONSPIRED MGDPA VIOLATION" and violated his civil rights, his rights to due process and equal protection under the law, and amounted to discrimination.

In Count IX, plaintiff charged that Moore knew or should have known that the transcript of plaintiff's 911 calls unlawfully intermingled his calls with the 911 call by Cook and was done for the purpose of concealing and suppressing his second 911 call on August 15, 2005.  As a consequence, plaintiff claimed the second 911 call was not disclosed to plaintiff based on willful neglect, deliberate indifference, gross negligence, amounted to a "CONSPIRED MGDPA VIOLATION," and violated plaintiff's state and federal civil rights.  Plaintiff further alleged that his civil rights were denied by Officer Crum because the citizens arrest form signed by Cook and the police reports by Officers Vang and Graupmann regarding his calls regarding his wallet and for supervision of Officer Vang were not produced to plaintiff as of March of 2006.

Count X charged all of the defendants with conspiring to violate the MGDPA, in violation of plaintiff's civil rights prohibiting discrimination and promoting equal protection under the law.  In this Count, plaintiff asked for an award of punitive damages.

Count XI charged the defendant City of St. Paul with instituting unlawful policies, practices, procedures and customs to falsify records or deny disclosure police records sought by plaintiff pursuant to the MGDPA, all in violation of plaintiff's civil rights.

Count XII charged all defendants with obstruction of justice due to their denial of the 911 records to plaintiff, which plaintiff alleged were vital to his attempt to withdraw his conviction in the Second Judicial District and up through the Minnesota Supreme Court.  Plaintiff claimed this conduct violated state and federal statutes and the First, Sixth and Fourteenth Amendments to the United States Constitution.

In Count XIII, plaintiff alleged all defendants with intentionally inflicting mental anguish and emotional distress to him from their denial of disclosure of the records sought under the MGDPA, the assault by Officer Vang, the permanent loss of plaintiff's personal property, and the discrimination by Officer Graupmann, the City and its agents who sought to conceal the offense against plaintiff.

In Count XIV, plaintiff alleged that Officer Vang and the City failed to issue plaintiff a citation for trespassing citation prior to his arrest or subsequent to his custodial detention at the Ramsey County Jail, which plaintiff claims constituted discrimination and denial of equal protection under the law.  Further, plaintiff alleged that the City of St. Paul denied plaintiff's civil rights and engaged in discrimination by detaining him rather that allowing him to defend or pay a fine.  Plaintiff also alleged that he suffered discrimination because he was forced to pay a $5.00 copy fee when he requested a copy of the trespassing citation.

Count XV alleged that the City of St. Paul failed to properly train or provide proper supervision of its officials, employees and agents in every act or omission of the MGDPA and civil rights violations.

Count XVI alleged that Officer Vang, Officer Graupmann, and the City of St. Paul failed to draft police reports regarding plaintiff's August 15, 2005 calls, which violated plaintiff's rights to obtain the reports under the MGDPA to use for evidentiary purposes in connection with his trespass charge, and violated state and federal statutes and the Fourteenth Amendments of the Constitution prohibiting discrimination and equal protection under the law.

Count XIX charged Officer Vang with failing to create accurate, complete and truthful property records relating to the items taken from plaintiff at or after his arrest for trespass on August 15, 2005, which then denied plaintiff his rights to obtain these records under the MGDPA.   This Count also charged the City of St. Paul with discrimination in violation of the MHRA, failure to properly train and supervise Officer Vang, and implementation of an unlawful policy, practice, custom and procedure with respect to Officer Vang's failure to create accurate property records.

Count XXV charged St Paul City Attorney John Choi and the City of St. Paul with manufacturing inaccurate 911 records and transcripts, which were provided to the City of St. Paul's Internal Affairs Unit in order to undermine plaintiff's administrative complaint against Officer Vang for excessive force and theft.   In addition, plaintiff charged Choi and the City of St. Paul with the provision of inaccurate 911 records and transcripts to the Board of P.O.S.T. regarding plaintiff's complaints against Officers Vang and Graupmann and to the Minnesota appellate courts in connection with his

effort to overturn his trespass conviction. Plaintiff claimed that this conduct constituted discrimination and the denial of his civil rights, due process and equal protection under the law, all in violation of his procedural and substantive due process rights, the MHRA, and his civil rights under 42 U.S.C. §§ 1981, 1983, 1988, and 2000(a).

In setting out this summary of plaintiff's claims, the Court notes that oftentimes it has had great difficulty in understanding the substance of the various counts alleged by plaintiff. Suffice it to say, at the end of the day, this Court believes that his claims generally fall into three categories. The first category involves defendants' alleged violations of the MGDPA surrounding plaintiff's request for records following his arrest and conviction for trespass. In this regard, plaintiff appears to seek relief under the MGDPA for defendants' alleged failure to create records, their creation of allegedly false records, their statements regarding the requirements of the MGDPA, their alleged efforts to conceal records, and ultimately, their failure to produce records sought by plaintiff at all or on a timely basis. The second category of claims involves plaintiff's assertions that defendants' conduct relating to their encounter with him on August 15, 2005 at the Radisson Hotel and subsequent handling of his request for records bearing on that encounter amounted to discrimination against plaintiff, a violation of his civil rights, or a denial of equal protection under the law. The third category of claims bear on the City of St. Paul's policies, procedures, supervision, and training of its employees with respect to their obligations to respond to emergency calls, comply with the MGDPA, prepare reports, and accurately record information. That said, the Court now proceeds to address the parties' respective motions for summary judgment.

III.    STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  Celotex, 477 U.S. at 327.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  DePugh v. Smith, 880 F. Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial."  Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D. Minn. 2003) (citations omitted).  The

non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy."  Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

When deciding a motion for summary judgment, a court can only consider admissible evidence.  See Henthorn v. Capitol Commc'ns, Inc., 359 F.3d 1021, 1026 (8th Cir. 2004); see also Stuart v. Gen'l Motors Corp., 217 F.3d 621, 636 n. 20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e).").

## IV.    DISCUSSION

### A.    Plaintiff's MGDPA Claims

Generally, plaintiff alleges that defendants Moore, Officer Crum, and the City of St. Paul violated the MGDPA by engaging in the following conduct: denying him disclosure of the records he sought (Counts III, IV, and VI); by telling him that there was a law prohibiting mailings of a taped version of the 911 calls (Count V); by overcharging him for a transcript of the 911 calls (Count VII); by deliberately delaying the MGDPA response to his request (Count VIII); by intermingling plaintiff's two 911 calls with Cook's call in order to suppress evidence of plaintiff's second 911 call (Count IX); by conspiring to violate the MGDPA (Count X); and by creating false property records (Count XIX).

The MGDPA "regulates the collection, creation, storage, maintenance, dissemination, and access to government data in government entities."  Minn. Stat. § 13.01, subd. 3.  Minn. Stat. § 13.08 provides in relevant part:

> Subd. 1. Action for damages. Notwithstanding section 466.03, a responsible authority or government entity which violates any provision of this chapter is liable to a person . . .  who suffers any damage as a result of the violation, and the person damaged . . . may bring an action against the responsible authority or government entity to cover any damages sustained, plus costs and reasonable attorney fees.  In the case of a willful violation, the government entity shall, in addition, be liable to exemplary damages of not less than $100, nor more than $10,000 for each violation. The state is deemed to have waived any immunity to a cause of action brought under this chapter.
>
> ******
>
> Subd. 4. Action to compel compliance. (a) In addition to the remedies provided in subdivisions 1 to 3 or any other law, any aggrieved person seeking to enforce the person's rights under this chapter or obtain access to data may bring an action in district court to compel compliance with this chapter and may recover costs and disbursements, including reasonable attorney's fees, as determined by the court.

See also Wiegel v. City of St. Paul, 639 N.W.2d 378, 382 (Minn. 2002) (citations omitted).  ("[P]ersons seeking access to data may bring a court action against the governmental entity in control of the data.  Specifically, a person may bring an action for damages for violation of the Data Practices Act, an action to enjoin practices that violate the Act, or an action to compel compliance with the Act.").

Under the MGDPA, "civil actions for damages may only be brought against 'a political subdivision, responsible authority, statewide system, or state agency....'.  The MGDPA "does not impose civil liability on individuals." M.P. ex rel. K., D.P. v. Independent School Dist. No. 721, New Prague, 200 F.Supp.2d 1036, 1045 (D.Minn. 2002) (quoting Minn.Stat. § 13.08, subd. 1 (2001) and Walker v. Scott County, 518 N.W.2d 76, 78 (Minn.Ct.App. 1994)).  Pursuant to Minn. Stat. §13.02, subd. 16, the term

"Responsible Authority" is defined for any political subdivision to mean "the individual designated by the governing body of that political subdivision as the individual responsible for the collection, use, and dissemination of any set of data on individuals, government data, or summary data, unless otherwise provided by state law."

As a preliminary matter, the Court finds that plaintiff can only assert claims premised on the MGDPA against the City of St. Paul, as a political subdivision, and against Moore in her official capacity as City Clerk for the City of St. Paul.  Moore has stated under oath that she, as the City Clerk of the City of St. Paul, is the responsible authority pursuant to Minn.Stat. § 13.02, subd. 16.   Hanson Aff., Ex. 17 (Defendant Shari Moore's Answers to Plaintiff's Interrogatories), Answer to Interrogatory No. 1. Defendants have also submitted the City of St. Paul Guidelines and Procedures for the Minnesota Government Data Practices Act, in which it is stated that Shari Moore is the responsible authority for compliance with the MGDPA.  Hanson Aff., Ex. 17 (Defendant Shari Moore's Answers to Plaintiff's Interrogatories) at STP 031.  Plaintiff has offered no evidence to support a claim that Officer Crum or any other individual defendant could be deemed to be a Responsible Authority and therefore liable for any claims under the MGDPA.  Thus, defendants should be granted summary judgment on plaintiff's claims against Officer Crum or any other individual under the MGDPA.[8]

As to plaintiff's MGDPA claims against Moore and the City of St. Paul, based on the undisputed facts set forth above, the Court finds that these claims have no merit and that defendants' motion for summary judgment on those Counts that assert claims based on the MGDPA (Counts III-X, and XIX ) should be granted.

---

[8]     As set out below in Section IV.C, infra, this Court notes that plaintiff has not sued any person in their individual capacity.

First, as to Count III, where plaintiff alleged was that it unlawful for Officer Smiley to deliver his request to Officer Crum, instead of Moore; for Officer Smiley or Moore to fail to acknowledge his MGDPA requests; and for Officer Crum to respond to plaintiff's request, instead of Moore, (Second Amended Complaint, ¶¶ 11, 12, 13, 17), plaintiff does not provide, and the Court can find no authority for the proposition that the person designated as the responsible authority under the MGDPA (i.e. Moore) is the only person who can address and provide responses to requests under the MGDPA. Further, plaintiff has cited to no authority for the proposition that Moore, as the responsible authority, was required to acknowledge his request.  All that Minn. Stat. § 13.03, subd. 3(a) requires is that "[u]pon request to a responsible authority or designee, a person shall be permitted to inspect and copy public government data at reasonable times and places, and, upon request, shall be informed of the data's meaning." (emphasis added).  Officer Crum was assigned as a Public Information Officer for the St. Paul Police Department in August of 2005.  See Hanson Aff., Ex. 12 (Second Crum Aff.), ¶ 2.  There is nothing in the MGDPA that dictates who must ultimately respond to plaintiff's MGDPA request or that it must be acknowledged upon receipt by anyone, much less the responsible authority.

Second, as to plaintiff's claims in Counts IV, V and VI that Officer Crum unlawfully refused to disclose Cook's 911 calls to him, and represented that plaintiff could not receive his 911 call tapes via certified mail but rather must present identification to receive them, (Second Amended Complaint, ¶¶ 18-20), it is true that Officer Crum informed plaintiff that 911 tapes could only be released to the caller, that he could not mail the 911 tape to plaintiff, and that he could not release the tape to

plaintiff without identification.  See Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 9; Pl. Summ. Judgmt. Mem., Ex. 9 (same); Ex. 13 (Second Crum Aff.), ¶¶ 9, 10; Pl. Summ. Judgmt. Mem., Ex. 9 (same).  Officer Crum's denial of plaintiff's request for the audio tape of Cook's 911 call did not violate the MGDPA; in fact, it complied with the statute.  The MGDPA provision regarding 911 calls states that "[t]he audio recording of a call placed to a 911 system for the purpose of requesting service from a law enforcement, fire, or medical agency is private data on individuals with respect to the individual making the call, except that a written transcript of the audio recording is public…"  Minn.Stat. § 13.82, subd. 4.  "'Private data on individuals' means data which is made by statute or federal law applicable to the data: (a) not public; and (b) accessible to the individual subject of that data."  Minn.Stat. § 13.02, subd. 12.  Pursuant to this statute, Officer Crum was prohibited from releasing the audio tape of Cook's call to plaintiff, but he could release the written transcript.

Further, Minn.Stat. § 13.82, subd. 4 dictates that 911 tapes contain confidential information that can only be released to the 911 caller.  Requiring proof that the requester of a 911 call is indeed the person who made the call to insure that it does not end up in the hands of the wrong person is consistent with the requirements of the statute.  There is nothing in the MGDPA which suggests that refusal to mail audio tapes or requiring identification of the requester before turning over private data is unlawful.

Third, plaintiff's contention in Count VI that Officer Crum unlawfully denied plaintiff disclosure of his 911 tape because he was maliciously motivated to protect defendant Officers Vang and Graupmann, (Second Amended Complaint, ¶ 21), has no basis in fact.  Plaintiff provided no evidence to support this contention.

Fourth, plaintiff alleges in Count VII that Officer Crum created a financial barrier for plaintiff by causing every 911 call made by plaintiff during August 2005 to be transcribed, and by unlawfully charging him for a transcript of 911 records he did not want, finds no support in the law or the facts.  Minn. Stat. §13.03, subd. 10 provides for costs for providing copies of data, and states that "[m]oney collected by a responsible authority in a state agency for the actual cost to the agency of providing copies or electronic transmittal of government data is appropriated to the agency and added to the appropriations from which the costs were paid."  Minn.Stat. § 13.82, subd. 4, which specifically addresses 911 calls, states that "[a] transcript shall be prepared upon request. The person requesting the transcript shall pay the actual cost of transcribing the call, in addition to any other applicable costs provided under section 13.03, subdivision 3."  As such, Officer Crum did not violate the MGDPA when he informed plaintiff that he had to pay for copies of transcripts, and other documents.

Moreover, the facts before this Court show that plaintiff asked for disclosure of all four calls that occurred in August 2005. See Hanson Aff., Ex. 10 (First Smiley Aff.), ¶ 2, Ex. A; Pl. Summ. Judgmt. Mem., Ex. 2 (same).  Specifically, on August 31, 2005, plaintiff requested "Disclosure of 911 Dispatch Records, documents, and recordings, 08-14-05, between 11:00 p and 11:59 p, 08-15-05, between 12 a and 1:30 a, Radisson Hotel, pay phone, and service desk, also, 911 dispatches of 8-28-05, detained." (emphasis added). Id., Ex. A.  At the end of October 2005, Officer Crum notified plaintiff that all four calls had been transcribed and were ready for him to pick up.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 11; Pl. Summ. Judgmt. Mem., Ex. 9 (same).  Plaintiff never

informed Officer Crum that he did not want the August 28, 2005 calls.  Plaintiff was required to pay for the transcription of any calls produced to him at his request.

Fifth, with respect to plaintiff's allegations in Count VIII that defendants deliberately delayed their response to his MGDPA request and manufactured inaccurate records and transcripts in order to derail his challenge to his trespassing conviction, (Second Amended Complaint, ¶¶ 24, 74), this claim cannot survive for lack of legal or factual support.  Neither the MGDPA nor the policies of the St. Paul Police Department or City of St. Paul place time requirements on responding to a MGDPA request such as the one made by plaintiff.  Section 13.03, subd. 2(a) of the MGDPA states that "[t]he responsible authority in every government entity shall establish procedures, consistent with this chapter, to insure that requests for government data are received and complied with in an appropriate and prompt manner."  The City of St. Paul established MGDPA procedures in compliance with this provision.  Section IV-A of the City of St. Paul Guidelines and Procedures for the MGDPA states that "requested information is to be released as promptly as circumstances allow..."  Hanson Aff., Ex. 17 (Def. Moore's Answers to Interrogatories), STP 027-53.; Pl. Summ. Judgmt. Mem., Ex. 1 (same). Section IV-D-1 further states that "if access is authorized and the responsible authority or designee is not able to provide copies at the time the request is made, s/he shall supply copies as soon as reasonably possible.  Id.  Stated otherwise, the law places no affirmative duty on defendants to produce the information requested by plaintiff under the MGDPA within any prescribed time period.

Further, any attempt by plaintiff to argue that the alleged delay in producing records affected his ability to appeal his trespass conviction is precluded by the doctrine

set forth <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994).  In that case, the Supreme Court held that "[i]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid..., a [42 U.S.C.] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  512 U.S. 477, 486-87 (1994).  Because plaintiff has not shown that his trespass conviction was vacated, a claim that a delay in producing documents responsive to plaintiff's MGDPA request affected his ability to appeal his trespass conviction cannot proceed.

The facts before this Court also belie plaintiff's bare contention that defendants deliberately delayed responding to his MGDPA request.  Upon receiving his request at the end of August, 2005, Officer Smiley researched plaintiff's request, and communicated to plaintiff what he had found.  Hanson Aff., Ex. 10 (First Smiley Aff.), ¶ 3; Ex.11 (Second Smiley Aff.), ¶ 5, 6; Pl. Summ. Jdgmnt. Mem., Exs. 2, 3 (same).  In early September, the request was assigned to Officer Crum, and Officer Smiley provided the information he had found to Officer Crum.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶¶ 4, 7, Pl. Summ. Jdgmnt. Mem., Ex. 9 (same).  After several phone conversations with plaintiff about what could and could not be produced to plaintiff, he made a written request on October 14, 2005 to Officer Crum for the information.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶¶ 10, Ex. 14 (Letter dated October 14, 2005 from plaintiff to Officer Crum); Pl. Summ. Jdgmnt. Mem., Ex. 7 (same).  At the end of October 2005, Officer Crum notified plaintiff that the information he had requested was available

for him to pick up and informed plaintiff of the costs associated with the copying of this information.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶ 11, Ex. 15 (Fax transmittal dated October 28, 2005 from Officer Crum to plaintiff); Pl. Summ. Jdgmnt. Mem., Exs. 8, 9 (same).  Thereafter, it appears that plaintiff never did follow the prescribed procedure to obtain the information that he wanted prior to commencement of this suit.  In fact, to this date, the Court does not know if or when plaintiff ever obtained all of the information he had sought prior to the commencement of this suit.[9]

After plaintiff alleged that a second 911 call was missing, Officer Crum checked and see if the original tape was still available, but was told that it had already been recycled.  Hanson Aff., Ex. 12 (First Crum Aff.), ¶¶13, 14; Pl. Mot. for Summ. Judgmt., Ex. 9 (same).   Plaintiff's allegations of a missing 911 call were not confirmed until plaintiff subpoenaed Qwest during this suit and received records indicating two 911 calls from the pay phone at the Radisson Hotel for August 14 and 15, 2005.  Pl. Summ. Judgmt. Mem., Ex. 22 (Qwest subpoena response number 192782) and Ex. 23 (Qwest subpoena response number 196833).   After Assistant St. Paul City Attorney Riley received these Qwest records from plaintiff, she again contacted the Police Department to confirm that there was no record of a second 911 call.  Hanson Aff., Ex. 23 (Riley Aff.), ¶ 12; Pl. Summ. Judgmt. Mem., Ex. 62 (same).  On June 13, 2007, Riley received a computer printout from the Police Department that showed a second 911 call had been made from a pay phone at the Radisson Hotel on August 15, 2005.  Id., ¶13.

---

[9]    The Court surmises that by May 2006, plaintiff likely obtained at least part of his request for records because on May 17, 2006, he sent Moore the "Notice of Inaccurate Data," informing Moore that he believed the 911 records he received were not complete. Hanson Aff., Ex. 21 (Notice).  Plaintiff also informed Moore that he still had not received police reports that he had requested, including reports submitted by Officers Vang and Graupmann, and a citizens arrest form submitted by Nina Cook.  Id.

The record before this Court establishes that defendants completed plaintiff's request for records under the MGDPA on October 26, 2005.  Hanson Aff., Ex. 13 (Second Crum Aff.), ¶ 8; Pl. Mot. for Summ. Judgmt., Ex. 9.  Due to plaintiff's initial unwillingness to review the materials in person for free, or to pay for copies of the tape and transcripts, plaintiff did not discover that the second 911 call was missing until he finally reviewed materials in the Spring of 2006.  According to Officer Crum, 911 tapes are recycled every 90-180 days as needed.  If plaintiff had reviewed the material that was gathered at his request when it became available at the end of October of 2005, the original tape from August 15, 2005 containing his second 911 call would have been available for disclosure and use at his post-conviction hearing on November 4, 2005.  On this record, this Court finds no evidence of delay by defendants in responding to plaintiff's MGDPA request.  The only delay that this record reflects is that for whatever reason, plaintiff waited until the Spring of 2006 to obtain the records he had requested.

Sixth, plaintiff's allegations in Count IX that Moore knew or should have known that the transcript of his 911 calls unlawfully intermingled the 911 call by Cook and was done for the purpose of concealing and suppressing his second 911 call on August 15, 2005 (Second Amended Complaint, ¶ 26), has no basis in the facts. The undisputed facts establish that Moore was not aware of the second 911 call until June 13, 2007, and plaintiff provided nothing to the contrary.  See Hanson Aff., Ex. 23 (Riley Aff.), ¶ 14.

Seventh, Count X, which charged all of the defendants with conspiring to violate the MGDPA, in violation of plaintiff's civil rights prohibiting discrimination and promoting equal protection under the law, cannot succeed based on the facts before this Court. Plaintiff did not specify whether he was alleging a common law conspiracy or one

29

pursuant to statute. However, since he alleged that the conspiracy was in violation of his civil rights prohibiting discrimination and promoting equal protection under the law, the Court presumes that he is alleging a conspiracy under 42 U.S.C. § 1985 as the basis for Count X.

In order to prove the existence of a conspiracy, plaintiff must prove that two or more persons did the following:

> (1) "[C]onspire... (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." ... that one or more of the conspirators (3) did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States."

City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989); 42 U.S.C. § 1985(3).  "The 'purpose' element of the conspiracy requires that the plaintiff prove a class-based 'invidiously discriminatory animus.'"  Id. (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971)).

Here, plaintiff has neither alleged nor presented facts suggesting that two or more people reached an agreement of any kind, let alone an agreement to violate plaintiff's rights.  "[A] conspiracy is not presumed from the mere fact that it is alleged…allegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a meeting of the minds." Occhino v. Lannon, 150 F.R.D. 613, 623 (D.Minn. 1993) (citing Bey v. Bridgeton Police Department, 775 F.Supp. 1255, 1256 (E.D.Mo.1991).  "Allegations of a conspiracy, absent supporting facts, do not establish a claim upon which relief may be granted."  Id. (citing Holbird v. Armstrong-Wright, 949

F.2d 1019, 1020 (8th Cir.1991); Rogers v. Bruntrager, 841 F.2d 853, 856 (8th Cir.1988) (citations omitted)).  Lacking any facts to support an agreement of any kind, much less one to violate the MGDPA, plaintiff's claim of a conspiracy must be denied.

Eighth, to the extent that plaintiff is asserting in Count XIX that false records were prepared by Officer Vang in violation of the MGDPA, this claim is meritless both factually and legally.  Plaintiff presented no evidence to support his claim that the records prepared by Officer Vang – the police report or inventory of the items taken from plaintiff upon his arrest – contained any false or inaccurate information.  Further, the MGDPA does not govern the contents of records; rather it dictates the handling and dissemination of records once they have been created.

Finally, all of plaintiff's MGDPA claims fail for lack of any evidence of damages he suffered as a result of the alleged violation.  Although he alleges damages, plaintiff has not shown that he has been damaged by the alleged withholding of or delay in producing records.  See Rivkin v. Hennepin County, 2002 WL 31777800 at *7 (D.Minn. Dec. 12, 2002) ("Other than generally alleging emotional harm, Rivkin has made no showing that the disclosures in [defendant's] letter caused her any damages. Because damages are an essential part of a claim under the MGDPA…Rivkin's MGDPA claim fails for this reason.").

Additionally, plaintiff has failed to show that he was directly harmed by defendants wrongful withholding of the information.

> Even if the District had delayed too long in informing Moubry that the phonetic inventory records did not exist, the Plaintiff has not incurred any resulting damages. The Plaintiff argues that he need not establish the amount of damages suffered, because the precise measure of damages is to be resolved by a finder of fact. Nevertheless, at a minimum, the Plaintiff must establish that he has suffered some injury-in-fact, as a result of the

alleged MGDPA violation. Cf., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (injury must be "concrete and particularized"). We do not sit to decide hypothetical questions about the MGDPA, or any other law, which does not concretely affect the rights of the litigants. The Plaintiff has not demonstrated an issue of material fact-namely, that he has suffered any injury because of the District's short delay in informing him that the requested material was unavailable-and, therefore, the factfinder would have nothing to decide. As a consequence, his MGDPA claim is dismissed.

Moubry v. Independent School Dist. 696, Ely, Minn., 9 F.Supp.2d 1086, 1112 (D.Minn. 1998).

The only harm which plaintiff has submitted resulted from either the alleged withholding or delay in production of records is that he was prevented from presenting evidence to the district court to challenge his trespassing charge in connection with his post-conviction motion or on appeal.  However, not only are the underlying predicates to this claim not supported by any evidence before this Court, but as discussed above, a claim that plaintiff was wrongfully convicted because he was denied the information he sought pursuant is precluded by the Heck v. Humphrey doctrine.

In sum, the record before this Court establishes as a matter of law that defendants did not violate any provision of the MGDPA.  They did not withhold information; they did not delay in responding to plaintiff's request for information; and they did not delay in producing what he wanted.  If plaintiff did not get what he wanted or when he wanted it, it is because he refused to exercise the two options for receiving the information that was gathered and prepared for him at his request – either review it in person or pay for copies.  For all of these reasons, this Court recommends that defendants' motion for summary judgment on all counts that assert a violation of the MGDPA (Counts III – X, and XIX) be granted.

**B.      Claims of Violation of Civil Rights, Discrimination, and Equal Protection**

Many of plaintiff's Counts allege that defendants' conduct violated his civil rights, constituted discrimination, or amounted to a denial of equal protection under the law. Some of the Counts explicitly refer to violations of certain state or federal statutes such as the MHRA, Minn.Stat. 363A, 42 U.S.C. §§ 1981, 1983 and 2000 et seq; many do not. Instead they refer generally to violations of state and federal laws (which this Court presumes refer to the previously listed statutes).   In any event, regardless of how plaintiff has characterized his claims of discrimination, none of them succeed because he has submitted to this Court no evidence, as opposed to allegations or argument, to make out the elements of such claims, including the most fundamental element of all – that his race, color, religion or alleged mental disability[10] played a role in the conduct that plaintiff claims to be actionable.  Lacking such evidence that plaintiff's race, color, religion or mental status played any role in defendant's conduct is fatal to all of plaintiff's claims that are premised on claims of discrimination, violations of civil rights or of equal protection under the law.  Therefore, as explained in greater detail below, to the extent that plaintiff has alleged in Counts I, II, III, IV, VI, VIII, X, XIII, XIV, XVI, XIX, and XXV

---

[10]    Plaintiff never identified in any Count alleging discrimination, violation of his civil rights or rights to equal protection under the law, which protected classification had been infringed upon by defendants' conduct.   The only reference in the Second Amended Complaint to "class" was in the paragraph entitled "Plaintiff's Class Requirements Pursuant to Title 42, Sects. 1983, 1985 (1)(2)(3), et. seq. For Reliefs Sought."  Second Amended Complaint, pp. 14-15.  In this paragraph, plaintiff stated that he is a "Melanic, hyphenated Amerikan, by virtue of both his origin, . . . and complexion; that he suffers from a mental illness, which he claims entitles him to protection under the laws of this country; and that he is both a political activist and is a person who believes in God, and is therefore in need of protection.  Id.  Giving plaintiff every benefit of the doubt, the Court has assumed for its analysis that he is asserting discrimination based on race, color, religion and disability.

that defendants' conduct amounted to discrimination, or violations of civil rights or rights to equal protection under the law, this Court recommends that summary judgment be entered in defendants' favor on these Counts.

### 1.   MHRA Claims

In Counts I, II, XIX and XXV, plaintiff alleged that the following conduct by Officer Graupmann, the City of St. Paul, and St. Paul City Attorney John Choi violated the MHRA: Officer Graupmann failed to investigate plaintiff's second 911 call requesting supervision of Officer Vang (Count I); Officer Vang and Officer Graupmann failed to respond to the 911 calls made by plaintiff (Count II); the City of St. Paul failed to properly train and supervise Officer Vang, and implemented an unlawful policy, practice, custom and procedure with respect to Officer's Vang's failure to create accurate property records (Count XIX); and Choi and the City of St. Paul manufactured inaccurate 911 records and transcripts to undermine plaintiff's administrative complaint against Officer Vang, and provided inaccurate 911 records and transcripts to the Board of P.O.S.T. regarding plaintiff's complaints against Officers Vang and Graupmann and to the Minnesota appellate courts in connection with his effort to overturn his trespass conviction (Count XXV).  Plaintiff never indicated which statute under the MHRA he was claiming relief.  Thus, the Court assumes that he was proceeding under Minn. Stat. § 363A.12, subd. 1, as it is the only one that addresses the provision of services.

Section 363A.12, subd. 1 protects individuals against discrimination "in the access to, admission to, full utilization of or benefit from any public service because of race, color, creed, religion, disability, national origin, marital status, sexual orientation,

or sex….."  Public services include law enforcement services.  See State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 570 (Minn. 1994).

For claims arising under § 363A.12, "a showing of the fact of discrimination is the sine qua non.  To maintain a discrimination case under the MHRA, a complainant must establish a prima facie case of discrimination."  Thomas v. City of St. Paul, 526 F.Supp.2d 959, 968 (D.Minn. 2007) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  "Plaintiff must produce evidence of a discriminatory motive."  Id. (citing Sigurdson v. Isanti County, 386 N.W.2d 715, 720 (Minn. 1986)).

Plaintiff can establish a prima facie case under § 363A.12, subd. 1 by showing "(1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for the existence of a difference [race, color, religion or disability]; or (2) treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation."  City of Minneapolis v. Richardson, 239 N.W.2d 197, 202 (Minn. 1976); see Greiner v. City of Champlin, 27 F.3d 1346, 1355 (8th Cir. 1994) ("Under this statute, [plaintiff] must show that she was treated differently with respect to public services than others similarly situated except for gender, or that treatment of her was so different from what would be expected that discrimination is the probable explanation") (citing City of Minneapolis v. Richardson, 307 Minn. 80, 239 N.W.2d 197, 202 (1976)).

Other than merely claiming that defendants discriminated against him, plaintiff submitted no evidence to establish that his race, color, religion or disability was a factor

in defendants' alleged wrongful conduct.  Further, plaintiff presented no evidence to show that Officer Graupmann, Officer Vang, the City of St. Paul or Choi treated plaintiff differently than others who were similarly situated; or that their treatment of him was so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation.  See Richardson, 239 N.W.2d at 202. Finally, plaintiff offered no evidence to show that defendants had a discriminatory motive.  As such, defendants are entitled to summary judgment on plaintiff's claims under the MHRA as alleged in Counts I, II, XIX and XXV, and all Counts in which plaintiff generally alleged discrimination in violation of any state statutes (Counts I, II, III, IV, VI, VIII, X, XIII, XIV, XVI, XIX, and XXV).

### 2.    §1981 Claims

Section 1981 provides for equal rights under the law and states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  In order to prevail on a claim under §1981, plaintiff must show (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) and that the discrimination interfered with a protected activity as defined in §1981.  Bediako v. Stein Mart, Inc., 354 F.3d 835, 839 (8th Cir. 2004).

The Court notes that it is not clear from the Second Amended Complaint whether plaintiff is relying on the Right-to-Contract Clause of §1981 or the Full-and-Equal-Benefit

Clause of §1981.  However, because there is no support for the proposition that plaintiff had a contract with any of the defendants and plaintiff has not advanced such a claim, the Court will assume that his claim is brought pursuant to the Full-and-Equal-Benefit Clause.

Plaintiff claims membership in a protected class on the basis of being a Melanic Amerikan, thereby satisfying the first prong under §1981.[11]  However, plaintiff has failed to present any evidence that defendants discriminated against him based on race, much less that defendants intended to discriminate against him on this basis.

Lacking any evidence that defendants discriminated against plaintiff based upon race or that they had any discriminatory intent, defendants' motion for summary judgment as to Counts I, II, and XXV, to the extent they are premised on § 1981, should be granted.

### 3.    Equal Protection Claims

In Counts I, III, VI, VIII, X, XIV, XVI, and XXV, plaintiff alleged defendants violated his right to equal protection as guaranteed to him by the Fourteenth Amendment.[12]  The Equal Protection Clause states as follows:

---

[11]    Plaintiff does not specifically state for which protected class Melanic Amerikans qualify.  However, based upon the language in plaintiff's Second Amended Complaint that Melanic Amerikans ancestrally descended from Afrika,. ." the Court will treat the classification of plaintiff as a Melanic Amerikan as a racial classification.  See Second Amended Civil Complaint, pp. 14-15.

[12]    In light of plaintiff's allegations in his Complaint that he is a member of protected classes (Second Amended Complaint, p. 14-15), his mention of the "XIV Amendment" (Id., p.10), and his numerous references to "equal protection" in conjunction with his assertions of discrimination, the Court has concluded that plaintiff is claiming that he was deprived of his right to equal protection as guaranteed to him by the Fourteenth Amendment.

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

The Equal Protection Clause generally requires the government to treat similarly situated people alike. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). In order to succeed on an equal protection claim, a claimant must prove that he has been treated differently from other similarly situated individuals, either by operation of a state law or regulation, or by a decision by a state official. See Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("[i]n general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), cert. denied, 534 U.S. 816 (2001) (citing Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995)). "[T]he first step in an equal protection case is determining whether the plaintiff has demonstrated that he was treated differently than others who were similarly situated to him." Klinger, 31 F.3d at 731. Absent a threshold showing that he is similarly situated to those who allegedly receive favorable treatment, the plaintiff does not have a viable equal protection claim. Id.

In addition to showing that he has been treated differently from others who are similarly situated, an equal protection claimant must also show, by direct or circumstantial evidence, that discriminatory intent was the motivating factor for the differentiation in treatment. See Vill. of Arlington Heights v. Metropo. Hous. Dev. Corp., 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.").

Here, plaintiff has proffered no evidence regarding defendants' treatment of others similarly situated.  As such, he has not met this threshold showing and does not have a viable equal protection claim.  In addition, plaintiff has provided the Court with no evidence that defendants had any discriminatory intent, much less that their conduct had anything to do with his race, color, religion or disability.  As such, plaintiff does not have a viable equal protection claim, and defendants are entitled to summary judgment on Counts I, III, VI, VIII, X, XIV, XVI, and XXV to the extent that these Counts assert a violation of plaintiff's right to equal protection under the law.

### 4.   § 2000(a)

In Counts I, II, and XXV, plaintiff alleged that the following conduct by Officer Graupmann, the City of St. Paul, and St. Paul City Attorney John Choi violated 42 U.S.C. § 2000(a):   Officer Graupmann failed to investigate plaintiff's second 911 call requesting supervision of Officer Vang (Count I); Officer Vang and Officer Graupmann failed to respond to the 911 calls made by plaintiff (Count II); and Choi and the City of St. Paul manufactured inaccurate 911 records and transcripts to undermine plaintiff's administrative complaint against Officer Vang, and provided inaccurate 911 records and transcripts to the Board of P.O.S.T. regarding plaintiff's complaints against Officers Vang and Graupmann and to the Minnesota appellate courts in connection with his effort to overturn his trespass conviction (Count XXV).

42 U.S.C. §2000(a) states in pertinent part that: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national

origin." Thus, the statute prohibits discrimination or segregation in places of public accommodation based on race, color, religion, or national origin.

Under § 2000(a), plaintiff must show that he was treated in a manner which, but for his race, color, religion or disability, he would have been treated differently. See Adams v. Boy Scouts of America, 2000 WL 33671779 at *6 (citation omitted). Thus, in order to establish a prima facie case of race discrimination based on disparate treatment, he must prove that (1) he is a member of a protected group; (2) he was similarly situated by circumstance to other individuals not members of such a group; (3) that he was treated more harshly or disparately than other similarly situated non-group members. Id. (citations omitted); see also McCoy v. Homestead Studio Suites Hotels, 390 F.Supp.2d 577, 584-85 (S.D. Tex., 2005.) ("In the public-accommodations context, . . . a plaintiff establishes a prima facie case of discrimination by showing that he or she (1) is a member of a protected class; (2) attempted to exercise the right to full benefits and enjoyment of a place of public accommodation; (3) was denied those benefits and enjoyment; and (4) was treated less favorably than similarly situated persons who are not members of the protected class."). Applying this analysis to here, plaintiff's § 2000(a) claim fails for several reasons: First, he has not alleged nor has he offered any evidence that he was denied access to any public accommodation. Counts I, II and XXV focus on denial of services, not denial of access to a public accommodation.

Second, plaintiff has presented no evidence that he was treated less favorably than others who were not members of a protected class. Third, he has not presented any evidence to support the inference that race, color, religion or national origin was a motivating factor. See Adams ex rel. Harris v. Boy Scouts of America-Chickasaw

<u>Council</u>, 271 F.3d 769, 778 (8th Cir. 2001) (§ 2000(a) claim failed because the evidence did not adequately support the inference that race was a motivating factor).   As such, plaintiffs' claims under § 2000(a) must fail and defendants' motion to grant summary judgment on Counts I, II and XXV should be granted.[13]

### 6.      Obstruction of Justice

In Count XII, plaintiff charges all defendants with obstruction of justice due to their denial of the 911 records to plaintiff, which plaintiff alleged were vital to his attempt to withdraw his conviction in the Second Judicial District and up through the Minnesota Supreme Court.   Plaintiff claimed this conduct violated state and federal statutes and

---

[13]      Courts within the Eighth Circuit have held that a § 2000(a) claim may only be asserted if a plaintiff is seeking injunctive relief.   In this regard, 42 U.S.C. § 2000a-6(b) states:

> The remedies provided in this subchapter shall be the exclusive means of enforcing the rights based on this subchapter, but nothing in this subchapter shall preclude any individual or any State or local law not inconsistent with this subchapter, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right.

This section was 'inserted only to make clear that the substantive rights to the Public Accommodation Act [later codified as Section 2000(a)] defined in § 201 and § 202 are to be enforced exclusively by injunction.'"   <u>Adams</u>, 2000 WL 33671779 at *5 (quoting <u>United States v. Johnson</u>, 390 U.S. 563, 567 (1968)).   "'Congress deliberately provided no damages remedy in the Public Accommodation Act itself, and § 207(b) provides that the injunction remedy of § 206 was the 'exclusive means of enforcing the rights based on this title.'"   <u>Id.</u> (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 152 n.5 (1970).   <u>See also Sherman v. Kasotakis</u>, 314 F.Supp.2d 843, 878 (N.D.Iowa 2004) ("It is undisputed that violation of 42 U.S.C § 2000a is enforceable only through injunctive relief.") (citing <u>Adickes</u>, 398 U.S. at 150, 152 n. 5; <u>Johnson</u>, 390 U.S. at 564; <u>Newman v. Piggie Park Enter., Inc.</u>, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); <u>Wilson v. Waffle House</u>, 1998 WL 1665880, at *1 (M.D.Ala. Apr.28, 1998)).   In his Second Amended Complaint, plaintiff has only sought monetary relief.   Thus, the lack of a request for injunctive relief would also be another basis for granting summary judgment on any claim brought under 42 U.S.C § 2000(a).

the First, Sixth and Fourteenth Amendments to the United States Constitution.  In his supporting memorandum, plaintiff states that defendants are liable for obstruction of justice pursuant to 42 U.S.C. §§ 1983 and 1985(1)(2)(3).  Pl. Summ. Judgmt. Mem., pp. 47-48.

The Court finds the obstruction of justice claim is not viable for three reasons.  For starters, the Court has already denied plaintiff's motion to amend his Complaint to add claims under the First and Sixth Amendments because neither amendment supported a cause of action for plaintiff.  See Order dated September 20, 2007, pp. 15-16.  [Docket No. 240].  Further, this Court just rejected plaintiff's claims under 42 U.S.C. § 1985(1)(2)(3), (see Section IV.A, supra), and also did so in connection with a similar obstruction of justice claim that plaintiff previously attempted to add.  See Order dated September 20, 2007, p. 24.

Second, to the extent that plaintiff is claiming a violation of the equal protection clause under the Fourteenth Amendment, plaintiff has not presented facts to support such a claim.  Third, to the extent that plaintiff is alleging that his prosecution for trespass arising from the events of August 15, 2005, and the events of his subsequent appeal, resulted in an unconstitutional conviction, this claim is precluded by Heck v. Humphrey, as discussed above.  Plaintiff has presented no evidence or argument that his trespass conviction has been vacated; in fact, plaintiff's conviction has been upheld by both the Minnesota Court of Appeals as well as the Minnesota Supreme Court.  See O'Neal v. State of Minnesota, 2006 WL 2947470 at *1 (Minn.App. Oct. 17, 2006). Because plaintiff's conviction for trespass has never been declared invalid in any state or federal post-conviction proceeding, plaintiff cannot maintain a civil action seeking

42

damages (or any other relief) based on that conviction.   Defendants' motion for summary judgment on Count XII should be granted.

### 7.    Claim for Attorneys Fees

Plaintiff requested attorneys fees under 42 U.S.C. § 1988 in Counts I and II, and at the end of his Second Amended Complaint (p. 16).   Whether or not plaintiff was successful in this suit, as a pro se litigant, he is not entitled to attorneys fees as a matter of law.   See White v. Armontrout, 29 F.3d 357, 361 (8th Cir. 1994).   Thus, summary judgment on any such claim should be granted to defendants.

In summary, because plaintiff has come forward with no evidence to support his claims of discrimination pursuant to the MRHA, 42 U.S.C. §§ 1981, 1983, and 2000(a), or the Equal Protection Clause, this Court recommends defendants' motion for summary judgment be granted for all Counts that seek relief based on these grounds or based generally on claims of discrimination or violation of plaintiff's civil rights pursuant to state and federal statutes (Counts I, II, III, IV, VI, VIII, X, XIII, XIV, XVI, XIX, and XXV).   Finally, the Court recommends dismissal of plaintiff's request for attorneys fees pursuant to 42 U.S.C. § 1988.

### C.    Claims against Officer Vang

In Count II, plaintiff alleged that Officer Vang did not make an intended dispatch response in violation of his responsibilities under discriminatory motives.   In Count XIV, plaintiff charged Officer Vang with failure to issue him a trespassing citation so that he could have avoided detention.   In Count XVI, plaintiff claimed that Officer Vang failed to draft a police report regarding the incident on August 15, 2005.   In Count XIX, plaintiff

charged Officer Vang with failure to create accurate property records and falsifying property records.

Defendants contend that any suggestion that plaintiff has sued Officer Vang in his individual capacity must be rejected for two reasons: first, he was never served with the Summons and Complaint; and second, plaintiff failed to state in his Second Amended Complaint that he was bringing a claim against Officer Vang in his individual capacity. Consequently, defendants assert that Officer Vang is not a proper party to this case and should be dismissed. This Court agrees.

"Proper service of process is necessary because, "'[i]f a defendant is improperly served, a federal court lacks jurisdiction over the defendant.'" Redding v. Hanlon, 2008 WL 762078 at *5 (D.Minn. March 19, 2008) (citing Printed Media Services, Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir.1993), citing Dodco, Inc. v. American Bonding Co., 7 F.3d 1387, 1388 (8th Cir.1993); see, Murphy Bros., Inc. v. Michetti Pipe Stringing, 526 U .S. 344, 350 (1999); Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982); Personalized Brokerage Services, LLC v. Lucius, 2006 WL 2975308 at *1 (D.Minn. Oct. 16, 2006)).

Fed. R. Civ. P. 4(e)(1) provides that service of process can be effected upon individuals, "pursuant to the law of the State in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State." Pursuant to Minnesota law, "a plaintiff may effectively serve a summons and complaint by two methods: personally under Minn. R. Civ. P. 4.03 or acknowledgment by mail under Minn. R. Civ. P. 4.05." Turek v. ASP of Moorhead, Inc., 618 N.W.2d 609, 611 (Minn.App. 2000), rev. denied (Minn. Jan. 26, 2001). Plaintiff "has the ultimate burden [of] establishing the validity of

service of process." Redding, 2008 WL 762078 at *6 (quoting A.C. ex rel. M.C. v. Ind. School Dist. No. 152, 2006 WL 3227768 at *4 n. 4 (D.Minn. Nov. 7, 2006), citing Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995)). A Court may dismiss an action without prejudice if service is not made "within 120 days after the filing of the complaint." Rule 4(m), Federal Rules of Civil Procedure.

This case began in Minnesota state court, and was removed to federal court by defendants on June 8, 2006. Section 1448, Title 28, United States Code provides:

> In all cases removed from any State court to any district court of the United States in which any one or more of the defendants has not been served with process or in which the service has not been perfected prior to removal, or in which process served proves to be defective, such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court.

Therefore, after removal, under Rule 4(m) of the Federal Rules of Civil Procedure, plaintiff had 120 days from the day the case was removed to properly serve all of the defendants in this matter, if he had not yet done so. Based on this 120-day rule, he had until September 8, 2006 to effect proper service.

Defendants raised plaintiff's failure to serve Officer Vang in their Answer to plaintiff's Complaint and their Answer to his Second Amended Complaint. See Answer, p. 5 [Docket No. 2]; Answer to Second Amended Complaint, p. 12. [Docket No. 244]. The record does not show that plaintiff ever cured this defect, nor does plaintiff state that he ever served Officer Vang with a copy of the Summons and Complaint. If plaintiff has not properly served a defendant, then this Court lacks jurisdiction over the defendant. See Dedco, 7 F.3d at 1388 ("If a defendant is improperly served, the court

lacks jurisdiction over the defendant.") (citing <u>Cohen v. Newsweek, Inc.</u>, 312 F.2d 76, 77-78 (8th Cir. 1963)).

On this record, the Court concludes that Officer Vang was never served with the Summons and Complaint and consequently, the Court lacks personal jurisdiction over Officer Vang.

Additionally, even if this Court had personal jurisdiction over Officer Vang, plaintiff could only seek relief against him in his official capacity.  "Public servants may be sued under section 1983 in either their official capacity, their individual capacity, or both."  <u>Johnson v. Outboard Marine Corporation</u>, 172 F.3d 531, 535 (8th Cir.1999) (citing <u>Murphy v. Arkansas</u>, 127 F.3d 750, 754 (8th Cir. 1997).  "In order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity."  <u>Johnson</u>, 172 F.3d at 535 (citations omitted).  In order to sue a defendant in their individual capacity, a plaintiff is required to place in his complaint "a clear statement of his wish to sue defendants in their personal capacities. Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient."  <u>Egerdahl v. Hibbing Community College</u>, 72 F.3d 615, 620 (8th Cir. 1995) (citing <u>Nix v. Norman</u>, 879 F.2d 429 (8th Cir. 1989)); <u>see also</u> <u>Artis v. Francis Howell N. Band Booster Assoc., Inc.</u>, 161 F.3d 1178, 1182 (8th Cir. 1998) ("If the complaint does not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity."); <u>Stahl Const. Co. v. State of Minnesota</u>, No. Civ. 03-3104 (JRT/JSM), 2004 WL 742058 at *3-4, (D. Minn. March 04, 2004) (requiring, pursuant to Eighth Circuit jurisprudence, that a plaintiff specifically

plead in a complaint that they are suing a defendant in their individual capacity).
Further, while a claimant may include the language "jointly and severally" in his prayer
for relief or in the caption of the suit, that phrase is not sufficient to infer that a defendant
is being sued in his individual capacity.  <u>See</u> <u>Nix v. Norman</u>, 879 F.2d at 431 (where
plaintiff only mentioned "joint and several liability" in her prayer for relief, Court found
that she failed to indicate with the requisite clarity that she sought damages directly from
defendant in his individual capacity).

Here, plaintiff named Officer Vang only in his official capacity.  This is evident for
several reasons.  First, in any Count in which Officer Vang is identified, plaintiff made no
mention of suing him in his individual capacity.   Second, in the paragraphs of the
Second Amended Civil Complaint entitled "Reliefs Sought," plaintiff stated that he
pleads for judgment "against herein defendants, JOINTLY; SEVERALLY; OFFICIALLY;
and, as both AGENTS, and MUNICIPALITY…"  Second Amended Civil Complaint, p.
15.  Third, the caption of the suit contains the same language.  <u>See</u> above caption.  As
such, this Court finds had plaintiff properly served Officer Vang, any claims against him
would be solely in his official capacity,[14] and are essentially claims against the City of
St. Paul.  A suit against a public employee in his or her official capacity is merely a suit
against the public employer.  <u>Johnson v. Outboard Marine Corp</u>., 172 F.3d 531, 535
(8th Cir. 1999).  Official-capacity suits "generally represent only another way of pleading
an action against an entity of which an officer is an agent."  <u>Monell v. New York City
Dept. of Social Services</u>, 436 U.S. 658, 690 (1978).  Accordingly, an official-capacity

---

[14]     For the same reasons, this Court finds that the other individuals named as
defendants in this case – Shari Moore, Officer Crum, Officer Graupmann and John Choi
– were sued only in their official capacity.

suit is, in all respects other than name, to be treated as a suit against the entity. Kentucky v. Graham, 473 U.S. 159, 166 (1989).

### D.      § 1983 Claims Against the City of St. Paul

Plaintiff asserted the following claims against the City of St. Paul: that the City has unlawful policies, practices, customs and procedures regarding the creation and disclosure of records in violation of plaintiff's civil rights (Count XI, XIX); that the City failed to train and supervise its employees, including Officer Vang, on the MGDPA and civil rights violations (Count XV, XIX); that the City failed to draft reports, accurate records, and accurate transcripts in violation of his rights under various federal statutes and his right to equal protection under the law (Count XVI, XIX and XXV); and that Officer Vang and the City failed to issue a trespassing citation to him in violation of his civil rights and right to equal protection under the law (Count XIV).

Section 1983 states in pertinent part "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…"   The first element required for a § 1983 claim is a determination of "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws' of the United States."   Doe v. Wright, 82 F.3d 265, 268 (8th Cir. 1996) (quoting Martinez v. California, 444 U.S. 277, 284, 100 S.Ct. 553, 558 (1980)).   The second element for a § 1983 claim is that "'the alleged deprivation was committed by a person acting under color of state law.'"   Shrum

ex rel. Kelly v. Kluck, 249 F.3d 773, 778 (8th Cir. 2001) (quoting West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).  Here, while plaintiff has alleged both elements – he has asserted violation of rights "secured by the Constitution and laws of the United States" and he has alleged that state actors committed these violations – he has presented no evidence in support of his allegations.

### 1.  Unlawful Policies, Practices, Customs and Procedures

In Counts XI and XIX, plaintiff asserted generally that the City of St. Paul instituted unlawful policies, practices, customs and procedures when it permitted its agents to falsify police records and improperly deny disclosure of records sought under the MGDPA.  Second Amended Complaint, ¶¶ 30, 44.

For a municipality to be liable under § 1983, a plaintiff must prove that a municipal policy or custom was the "moving force [behind] the constitutional violation." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  An "[o]fficial policy involves a deliberate choice to follow a course of action ... made from among various alternatives [ ] by an official who is determined by state law to have the final authority to establish governmental policy."  Ware v. Jackson County, Mo., 150 F.3d 873, 880 (8th Cir.1998) (quotations and brackets omitted).  A custom is "demonstrated by (1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) [t]he plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation." Id. (brackets omitted).

In this case, plaintiff has not established the existence of a policy, practice, custom or procedure which caused an alleged constitutional violation or violation of federal law.  Apart from his mere allegation that such policies, practices, customs and procedures exist, plaintiff offered nothing to show there was a continuing, widespread and persistent pattern of unconstitutional or federally prescribed conduct, that policymaking officials were indifferent to such conduct, or that such conduct was the force behind the alleged constitutional violations.  As such, defendants' motion for summary judgment with respect to plaintiff's claims in Counts XI and XIX based on unlawful policies should be granted.

### 2.  Failure to Train and Supervise

In Counts XV plaintiff alleged that the City of St. Paul failed to properly train and supervise its agents and employees with respect to the alleged MGDPA and civil rights violations.  Second Amended Complaint, ¶ 38.  Plaintiff also claimed in Count XIX that the City failed to train and supervise Officer Vang in the creation of accurate property records.  Second Amended Complaint, ¶ 44.

A municipality can be liable under § 1983 for the inadequate training and supervising of its employees.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989); see also Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997).  Specifically, a municipality may be liable for a failure to train only where the failure to train amounts to "deliberate indifference" to the rights of those with whom the employees of a municipality come into contact.  See City of Canton, 489 U.S. at 388; see also Gatlin ex rel. Gatlin v. Green, 227 F.Supp.2d 1064, 1078 (D.Minn. 2002) ("city may be liable for deficient training when its policies are inadequate, and where it can be shown to be

deliberately indifferent to the rights of others in adopting those polices.") (citation

omitted).  In addition, a municipality's failure to train must result in the plaintiff's injury.

See City of Canton, 489 U.S. at 391.

In order to make out a claim for failure to supervise, it must be shown that the

offending party:

> (1) Received notice of a pattern of unconstitutional acts committed by subordinates;
>
> (2) Demonstrated deliberate indifference to or tacit authorization of the offensive acts;
>
> (3) Failed to take sufficient remedial action; and
>
> (4) That such failure proximately caused injury. . . .

Otey, F.3d at 1155 (quoting Jane Doe A. v. Special Sch. Dist. of St. Louis County, 901

F.2d 642, 645 (8th Cir. 1990)).

Under Eighth Circuit jurisprudence, it is necessary to demonstrate that:

> [I]n light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In other words, the plaintiff must demonstrate that the city had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.

Otey, F.3d at 1156 (citing Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)).

Generally, one case of misconduct by a subordinate employee is not sufficient to prove

a claim under § 1983 for inadequate training and supervising, as there would be an

insufficient notice required for a showing of deliberate disregard.  See Patzner v.

Burkett, 779 F.2d 1363, 1367 (8th Cir. 1985) (citing Oklahoma City v. Tuttle, 471

U.S.808 (1985)); <u>see</u> <u>also</u> <u>Weseman v. Meeker County</u>, 659 F. Supp. 1571, 1579 (D. Minn. 1987).

Plaintiff has offered this Court neither evidence nor argument as to why the training and supervision of its employees, including Officer Vang, was inadequate. In fact, plaintiff has provided the Court no evidence on any of the four factors set forth above. Further, even if this Court were to find that Moore, Officer Smiley or Officer Crum had violated the MGDPA, their sole encounter with plaintiff would not have been sufficient to put the City of St. Paul on notice that its lack of training or supervision of these employees was inadequate and likely to result in a violation of constitutional or other federal rights. The same is true for the actions of Officer Vang – Officer Vang's singular encounter with plaintiff is not sufficient to give the City of St. Paul notice that its lack of training or supervision of him was inadequate and likely to result in a violation of constitutional or federal rights. In other words, based on the record before the Court, there is no direct or circumstantial evidence from which this Court could conclude that the City of St. Paul had the requisite knowledge to infer that its failure to train and supervise was inadequate and likely to result in a violation of any laws of the United States. As such, this Court recommends that defendants' motion for summary judgment be granted on Counts XV and XIX and that plaintiff's § 1983 claim for the City of St. Paul's failure to train and supervise be dismissed.

### 3. Failure to Issue Trespassing Citation

In Count XIV, plaintiff claimed that Officer Vang and the City of St. Paul failed to issue him a trespassing citation in violation of his civil rights and equal protection under the law. Second Amended Complaint, ¶ 34. To the extent plaintiff is claiming that he

was wrongfully prosecuted and convicted for trespass, this claim is precluded by <u>Heck v. Humphrey</u>.   Because plaintiff's conviction for trespass has never been declared invalid in any state or federal post-conviction proceeding, plaintiff cannot maintain a civil action seeking damages (or any other relief) based on that conviction.   On the other hand, to the extent that plaintiff is challenging the right of an officer to arrest a person instead of issuing him a citation, plaintiff has not provided this Court with any legal authority to support the proposition that where an officer has probable cause to arrest an individual, the officer must instead issue a citation.   Defendants' motion for summary judgment on Count XIV should be granted.

### 4.      Failure to Draft Police Reports

In Count XVI plaintiff alleged that Officers Vang and Graupmann, as well as the City of St. Paul, discriminated against him because they failed to draft police reports. Second Amended Complaint, ¶ 40.   This claim fails for several reasons.   First, this Court has already concluded that plaintiff has not made out a case of discrimination against any of the defendants.   Thus, even if plaintiff could show that failure to draft a police report was unlawful, he has not shown that no such reports were prepared because of his race, color, religion or disability.

Second, to the extent that plaintiff relied on any law as the basis for his claim that reports must be drafted, plaintiff maintained that this conduct was "unlawful, which he has identifying Minnesota laws."   Pl. Summ. Judgmt. Mem., p. 45.   Plaintiff then referenced Minn. Stat. § 609.43 and police departmental policy 416.00.   <u>Id.</u>, p. 45-46. However, violations of state laws cannot serve as a basis for a § 1983 action; only

violations of rights "secured by the Constitution and laws of the United States" can form the basis of a § 1983 action.

Third, § 609.43 is a criminal statute addressing misconduct of a public officer or employee, and does not provide a civil cause of action.

Lastly, police departmental policy 416.00, entitled "Report Writing," provides in relevant part, that every incident involving citizen reports of crime, citizen complaints, citizen requests for service when an officer is dispatched, an employee is assigned to investigate, or an employee is assigned to take action at a later time, and incidents involving arrests, citations, or summonses must be reported.  Pl. Summ. Judgmt. Mem., Ex. 26.  The policy further states that "documentation of the above listed categories shall be by one or more of the following: completed field report, citation, field interview card, complaint card or CAD entry."  Id.  Here, the record contains an Original Offense/Incident Report authored by Officer Vang, as well as a citation.  See Hanson Aff.; Ex. 7 (Citation), Ex. 8 (Original Offense/Incident Report dated August 15, 2005). Even if plaintiff had shown that a violation of departmental policy amounted to a federal civil rights violation, the evidence establishes that Officer Vang did comply with that policy.  As to Officer Graupmann's failure to prepare a report, the undisputed evidence is that she never arrived at the Radisson Hotel prior to her dispatch call being cancelled. See Hanson Aff., Ex. 6 (Def. Graupmann's Answers to Plaintiff's Interrogatories), Answer to Interrogatory No. 5).  As such, she had nothing to report.

For all of these reasons, defendants' motion for summary judgment on Count XVI should be granted.

**5.       Failure to Create Accurate Property Records**

In Count XIX, plaintiff maintained that Officer Vang falsified property records regarding the possessions taken from him when he was arrested and that this amounted to discrimination and a denial of civil rights.  Second Amended Complaint, ¶ 44.  Officer Vang's Original Offense/Incident Report indicated that he recovered "personal effects in green duffel bag" from plaintiff.  Hanson Aff., Ex. 8.  The actual property record states that Officer Vang recovered one bag of personal effects.  Id., Ex. 9.  Plaintiff offered no evidence to support his claim that Officer Vang's Report was false or inaccurate.  As to his claim that the record did not itemize or identify his possessions in violation of department policy 439.01, ( Pl. Summ. Judgmt. Mem., p. 54), a review of Policies 439.01-439.03 indicates that these policies contain no such provision.  See Hanson Aff., Ex. 17 (Defendant Moore's Answers to Plaintiff's Interrogatories) STP 013-18.  The only reference in the policies the Court could find that bears on plaintiff's claim is that the report must be "accurate, and with complete descriptive data of the property recovered thereon."  See Policy 439.03.  No evidence was presented by plaintiff to suggest that Officer Vang's statement in his report that he recovered "personal effects in green duffel bag" from plaintiff was inaccurate.  On this basis, defendants' motion for summary judgment on Count XIX should be granted.

E.   **State Tort Claims**[15]

1. **Negligence**

Plaintiff uses the term "gross negligence" in the title of Counts III through X of his Complaint.   In Count III, plaintiff alleges that Moore was negligent in denying him disclosure of the 911 records.   Second Amended Complaint, ¶ 9.   In Count IX, plaintiff alleges that defendant Moore was negligent in failing to prevent the disclosures of the 911 records to plaintiff.   Second Amended Complaint, ¶ 26.   In Count X, plaintiff appears to charge all defendants with gross negligence in conspiring to violate the MGDPA in violation of plaintiff's civil rights.   In Count XV, plaintiff asserts that the City of St. Paul was negligent in its failure to properly train and supervise its employees. Second Amended Complaint, ¶ 38.

When bringing a negligence claim, a plaintiff must prove: (1) the defendant has a legal duty to the plaintiff to take some action; (2) there was a breach of that duty; (3) the breach of the duty was the proximate cause of the harm to the plaintiff; and (4) damage. Gilbertson v. Leininger, 599 N.W.2d 127, 130 (Minn. 1999).

The Court acknowledges that under the MGDPA, defendants had a duty to plaintiff to comply with the MGDPA.   Even if these claims of negligence were not preempted by the MGDPA, where as here, the Court has already determined that there was no evidence of a MGDPA violation (and the evidence supports the proposition that defendants fully complied with the MGDPA), plaintiff has not met his burden of proving

---

[15]     In their submissions to the Court, defendants have addressed claims of assault, false imprisonment, excessive force and false arrest, arguing that they should be granted summary judgment on those claims based on qualified immunity.   However, after careful examination of plaintiff's Second Amended Complaint, the Court does not find that any such claims were asserted by plaintiff, and therefore does not address defendants' arguments.

that there was a breach of that duty. Plaintiff's allegations that defendants were negligent in violating the MGDPA are therefore without merit.

Similarly, as this Court has already found that plaintiff has not set forth any evidence that the City of St. Paul failed to properly train and supervise its employees, plaintiff's allegation that the City was negligent in this regard is also without merit. Defendants' motion for summary judgment on all Counts alleging negligence (Counts III through X and XV) should be granted.

### 2.   Intentional Infliction of Emotional Distress

The final state tort law claim alleged by plaintiff is intentional infliction of emotional distress. The Minnesota Supreme Court has held that there are four elements to a claim for intentional infliction of emotional distress: "(1) the conduct complained of was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress was severe." Kelly v. City of Minneapolis, 598 N.W.2d 657, 663 (Minn. 1999) (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428 (Minn. 1983)).

For an act to be extreme and outrageous, "the conduct must be extreme and outrageous, so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Hill v. Scott, 349 F.3d 1068, 1075 (8th Cir. 2003) (citation omitted). Here, the acts of the defendants carry no indication that these acts were extreme and outrageous.

Further, "[t]o state a claim, moreover, a plaintiff must allege facts showing that the acts caused severe emotional distress. General allegations of emotional distress are not enough." Parniani v. Cardinal Health, Inc., 2007 WL 2219373 at *9 (D.Minn.

June 29, 2007).  Plaintiff must show that his emotional distress rises to a level of which "no reasonable man could be expected to endure."  Hubbard, 330 N.W.2d at 436.

Plaintiff's evidentiary support does not meet the level necessary to support a claim for intentional infliction of emotional distress.  Plaintiff has submitted a medical record from August 28, 2005.  Pl. Summ. Judgmt. Mem., Ex. 44.  Plaintiff was treated by Dr. Timothy Thompson at St. Joseph's Hospital in St. Paul Minnesota.  Id.  Plaintiff complained of back pain and stress, and told Dr. Thompson that he had been prescribed Vicodin by his primary care physician but that it had been stolen by the police ten days prior.  Id.  Plaintiff also stated that his stress was brought on by his proceedings against the police department.  Id.  Additionally, he felt stress because he wanted to move to Wisconsin or Alabama but was on parole in Minnesota; he felt this was a "psychological assault from the government."  Id.  Plaintiff denied suicidal or homicidal ideation and denied hearing voices; he had previously been prescribed Seroquel[16] but did not know the diagnosis for which it was prescribed.  Id.  Dr. Thompson noted that plaintiff was alert, initially quite suspicious of him, but then made relatively good eye contact and was more forward with conversation.  Id.  Plaintiff was discharged and given Orudis,[17] and back pain instructions, and was urged to follow up with the Dorothy Day Clinic for back pain or any psychological issues.  Id.  This singular medical record, which contains very little information as to plaintiff's alleged emotional distress, is insufficient to support his claim.  At most, it suggests that he was experiencing stress because of his involvement with the police.  However, he must

---

[16]  Seroquel is indicated for the treatment of bipolar disorder.  www.seroquel.com.

[17]  Orudis is a pain reliever.  www.nlm.nih.gov/medlineplus/druginfo.

demonstrate that his emotional distress rises to a level of which "no reasonable man could be expected to endure." Hubbard, 330 N.W.2d at 436. Plaintiff has not made that showing. As such, defendants are entitled to summary judgment on this claim.

## IV.   CONCLUSION

In summary, while plaintiff's statements, beliefs, and arguments are extensive, he has not provided any evidence in support of his claims, despite having litigated this case for over two years. As such, plaintiff's claims fail as a matter of law, and summary judgment should be granted to defendants on all Counts in their entirety.

### RECOMMENDATION

For the reasons set forth above, it is recommended that:

1. Plaintiff's Motion for Summary Judgment [Docket No. 292] be DENIED, and

2. Defendants' Motion for Summary Judgment [Docket No. 253] be GRANTED.


Dated:        August 22, 2008



*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge



Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before September 8, 2008 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.